UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Screendollars LLC<br><br>                Plaintiff,<br><br>   v.<br><br><br>Sirius XM Radio Inc.,<br>Sirius XM Radio LLC,<br>Pandora Media, LLC (d/b/a Sirius XM Media)<br><br>          Defendants. | Case No. _____ |

**COMPLAINT**

Screendollars LLC ("Plaintiff"), by and through the undersigned counsel, brings this civil action ("Civil Action") against Sirius XM Radio Inc., Sirius XM Radio LLC, and Pandora Media, LLC (d/b/a Sirius XM Media) seeking injunctive and monetary relief for violations of Sections 32 and 43(a) of the Lanham Act (15 U.S.C. §1114 and 15 U.S.C. § 1125(a), respectively) and substantial and related claims under the statutory and common laws of Massachusetts, New York, and California, all arising from the unauthorized use of design marks (or "logos") in commerce that are confusingly similar to Plaintiff's design mark as used in connection with (i) the delivery of curated digital content to consumers and others on the web, social media and other digital platforms, and (ii) the sale of "ad slots" for third-party advertisements on such platforms.

Plaintiff alleges the following on knowledge as to its own actions and, otherwise, upon information and belief.

1

**PARTIES**

1. Plaintiff, Screendollars LLC ("Screendollars" or "Plaintiff"), is a limited liability company organized and existing under the laws of the Commonwealth of Massachusetts, with a principal place of business at 33 Miller Hill Road, Dover, Massachusetts 02030. The sole member of that limited liability company is Thaddeus Bouchard, a citizen of Massachusetts. Screendollars is a citizen of Massachusetts for purposes of 28 U.S.C. § 1332.

2. Defendant Sirius XM Radio Inc. is and/or was at all times relevant to this Civil Action a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 1221 Avenue of the Americas, 35th Floor, New York, New York 10020. Sirius XM Radio Inc. is a citizen of Delaware and New York for purposes of 28 U.S.C. § 1332.

3. Defendant Sirius XM Radio LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 1221 Avenue of the Americas, 35th Floor, New York, New York 10020. It is purported to have been formed through the conversion of Defendant Sirius XM Radio Inc., on or about September 6, 2024, under Section 18-214 of the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.) and Section 266 of the General Corporation Law of the State of Delaware (8 Del. C. § 101, et seq.). On information and belief, Sirius XM Radio LLC is a citizen of Delaware and New York for purposes of 28 U.S.C. § 1332.

4. Defendant Pandora Media, LLC (d/b/a Sirius XM Media) is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 1221 Avenue of the Americas, 35th Floor, New York, New York 10020. On

information and belief, Pandora Media, LLC (d/b/a Sirius XM Media) is a citizen of Delaware and New York for purposes of 28 U.S.C. § 1332.

5. Sirius XM Radio Inc., Sirius XM Radio LLC and Pandora Media, LLC (d/b/a Sirius XM Media) are referred to herein, individually and collectively, as "Defendant" or "Sirius XM," without prejudice to Plaintiff's right to seek and recover relief from any and all of them in this Civil Action.

6. Sirius XM Radio Inc., Sirius XM Radio LLC and Pandora Media, LLC (d/b/a Sirius XM Media) are affiliates and, more particularly, direct or indirect subsidiaries or business units of Sirius XM Holdings Inc., with a principal place of business at 1221 Avenue of the Americas, 35th Floor, New York, New York 10020, and are, on information and belief, individually and/or jointly responsible for the acts attributable to Defendant or Sirius XM discussed below and for which Plaintiff seeks redress in this Civil Action. Plaintiff reserves the right to join Sirius XM Holdings Inc., additional subsidiaries and other affiliates thereof, or other parties, as defendants if discovery or further investigation reveals that they are also responsible for such acts.

7. Plaintiff and Defendant are each referred to herein as a "Party" and, collectively, as the "Parties."

### JURISDICTION

8. This court has jurisdiction over this Civil Action pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1332(a), 1338(a) and (b), and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367. With respect to 28 U.S.C. § 1332(a), the amount in controversy exceeds $75,000, exclusive of interest and costs, and as set forth in ¶¶ 1 – 4, above, the Parties are completely diverse.

3

## VENUE

9.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to this Civil Action occurred in this district including, on information and belief, that Defendant has and continues to (i) offer and render the services for which Plaintiff seeks redress herein to Massachusetts residents, (ii) direct advertising and promotional communications bearing the infringing mark into this district, and (iii) cause a likelihood of confusion, mistake, or deception among persons in this district. Thus, for example, Plaintiff provides and promotes services under its design mark throughout the United States, including in Massachusetts, and Plaintiff estimates that such activity results in at least a few hundred thousand impressions of that design mark per month in this state alone (not to mention those in other states throughout the country). On information and belief, as a result of Defendant's activities, its confusingly similar marks make impressions on at least 1 in 10 persons in the United States, in general, and in Massachusetts, in particular, in connection with Defendant's provision and promotion of services similar to those of Plaintiff. As a consequence, Plaintiff estimates on information and belief that the number of persons in Massachusetts who encounter both Plaintiff's Mark and Defendant's Marks in connection with similar services offered by Plaintiff and Defendant, respectively, and who are likely to be confused, mistaken or deceived thereby is in the tens of thousands per month. In addition, Plaintiff's decision to use the design mark around which this Civil Action is centered, the nature and extent of Plaintiff's use of that mark, and the revenues and profits of Plaintiff derived therefrom, all occurred, or were directed from, Plaintiff's headquarters in Dover, Massachusetts.

4

**FACTS**

**<u>OVERVIEW</u>**

10.     Plaintiff and Defendant are both in the business of delivering curated digital content (hereinafter, "content provisioning") via web publishing, social media, and other digital media platforms to or for the benefit of those accessing the platforms for entertainment, business or otherwise. That curated content includes audio, video, still images, textual or other digital works of third parties or of the Parties' own respective creation.

11.     Plaintiff and Defendant also broker ad slots (hereinafter, "media brokering") on their own or others' digital media platforms for placement of advertisements, promotional or sponsorship announcements, or messages (collectively, "advertisements," "ad placements," and the like) of others. The Parties provide those media brokering services to

- advertisers, brands, and other principals that seek ad slots for such placements (collectively, with their employees, agents, representatives, and advisors, "Media Buyers"), whether acting directly or through intermediaries;

- intermediaries that broker, aggregate, or otherwise facilitate those placements (collectively, with their employees, agents, representatives, and advisors, "Media Intermediaries"); and

- where applicable, owners and operators of platforms with available ad slots for such placements (collectively, with their employees, agents, representatives, and advisors, "Media Sellers").

12.     On information and belief, Plaintiff and Defendant target the same or overlapping classes of Media Buyers and Media Intermediaries with their respective media brokering

services. Likewise, Plaintiff's content provisioning services target Media Buyers and Media Intermediaries, among others, who are also targeted by Defendant's media brokering services. And, also on information and belief, the Parties target the same audiences with their respective content provisioning services.

13. Plaintiff's content provisioning and media brokering services emphasize movies and the movie business; Defendant's are directed to entertainment more broadly, including movies and the movie business.

14. At least as early as April 2022, Plaintiff put its design mark — a five-pointed star centered within the letter "S" — into use in commerce in the color gold (see, Table 1, below, "Plaintiff's Mark (per common law)") with its content provisioning services, and at least as of June 2022 with both its content provisioning services and its media brokering services, and it has so used the mark continuously since.

15. Plaintiff applied for federal registration of Plaintiff's Mark in connection with certain of its services and, as discussed below, that registration issued without regard to color as United States Trademark Registration No. 7,621,658 (Table 1, "Plaintiff's Mark (per federal registration)"). Attached as **Exhibit 1** is a true and correct copy of that registration certificate as issued by the United States Patent and Trademark Office on December 24, 2024.

16. On information and belief, in or after November 2023, SiriusXM began using several marks (collectively, "Defendant's Marks") — each, a colorable variation of the others and, all, confusingly similar to Plaintiff's Mark — in commerce in connection with its content provisioning services and its media brokering services. Subsequent applications by Defendant to register a representative one of its marks ("Defendant's Mark

(representative)"), with and without a claim of color as a feature, at the USPTO are subject to opposition proceedings in the USPTO under 15 U.S.C. § 1063 between Screendollars and SiriusXM.

17. Plaintiff's Mark is reprinted in the table below, both in its unregistered (common law) form and its federally registered form (collectively, "Plaintiff's Mark"). Defendant's Mark ("representative") is reprinted alongside Plaintiff's Mark in the table below:

**Table 1**

  

| Plaintiff's Mark (per common law) | Plaintiff's Mark (per federal registration) | Defendant's Mark (representative) |
|---|---|---|

18. Defendant's use of Defendant's Marks in connection with its content provisioning and media brokering services is without the Plaintiff's consent, and, among other harms, is likely to cause confusion, mistake, or deception among Media Buyers, Media Sellers, and Media Intermediaries, consumers and others who consume content or acquire ad slots on web, social media or other digital media platforms.

19. Unless otherwise stated, all conduct alleged in this Complaint occurred in the United States and, likewise, all uses of marks alleged herein were directed to, or occurred in connection with, commerce in the United States.

**THE PLAINTIFF, SCREENDOLLARS**

20.    Plaintiff Screendollars has its roots as a family business, Yankee Film Productions, started by Merle Bouchard, in 1972, offering (i) media brokering services for in-theater ad placements to movie theater owners and operators ("Exhibitors") and to Media Buyers and Media Intermediaries, and (ii) content provisioning services to the Exhibitors for presentation at their theaters (along with ads from the Media Buyers or Media Intermediaries) for the benefit of moviegoers. Yankee Film Productions' niche was local theaters and advertisers.

21.    In 2015, Thaddeus Bouchard, the son of Merle Bouchard, formed Screendollars to expand those content provisioning and media brokering services. With expertise in digital media and relationships within the media buying and selling industry, Thaddeus Bouchard planned for Screendollars to extend Yankee Film Productions' original services to multiple digital media platforms, including:

- in-theater digital media platforms (e.g., in-theater movie screens and lobby kiosks);

- web publishing digital media platforms (e.g., websites);

- direct distribution digital media platforms (e.g., emails);

- social media digital media platforms; and

- on-demand audio/video digital media platforms (e.g., audio and video podcasts).

22.    Part of the plan was to continue to render content provisioning and media brokering services to the family legacy in-theater platforms — which, with the advent of modern projection systems, had themselves gone digital and, in the list above and discussion below, is referred to as a digital media platform.

23.    Thaddeus Bouchard anticipated that offering ad slots across multiple digital platforms would increase Screendollars' visibility among Media Buyers and Media Intermediaries and its ability to participate in brokering more and larger deals with them, whether for regional/national brands and ad campaigns, or otherwise. By at least as soon as 2021, Screendollars began actively executing that plan.

**THE PLAINTIFF'S USE OF ITS MARK ON
IN-THEATER DIGITAL MEDIA PLATFORMS**

24.    Around the time of its formation, Screendollars assumed the customer and vendor lists of Yankee Film Productions and took over its predecessor's in-theater digital media platform business: rendering content provisioning services to Exhibitors throughout the United States for the benefit of their moviegoing patrons, and rendering media brokering services to those Exhibitors, Media Buyers and Media Intermediaries. Screendollars continues with that to this day.

25.    Screendollars has since at least 2022 targeted marketing and sales of both of the foregoing in-theater services at Media Sellers (namely, Exhibitors), on the one hand, and, with respect to the media brokering services, at Media Buyers (e.g., brands, movie studios and distributors) and Media Intermediaries (e.g., ad networks, ad agencies), on the other hand. In addition to promoting and soliciting both services directly, i.e., via in-person meetings, telephone/video calls, direct email and paper mail, trade conferences and industry events, or otherwise (collectively, "direct solicitation"), Plaintiff publicizes the services through its other digital media platforms — particularly, for example, its weekly email newsletter and twice-weekly reports and its website.

9

26. From at least as early as June 2022 to present, Screendollars has continuously used Plaintiff's Mark in commerce throughout the United States in connection with rendering its in-theater content provisioning services and media brokering services. *See,* for example*,* **Exhibit 2**, attached hereto, at pp. 10 – 16, reproduced from an archival copy of the "Advertise with Us" pages of Plaintiff's website (www.screendollars.com/advertise-with-us) available as of June 29, 2022, throughout the United States, encouraging Exhibitors to use those services to entertain audiences in-theater (while generating advertising income) and encouraging advertisers to showcase their products to those audiences.[1] (Formatting discrepancies in the reproduction are, on information and belief, artifacts of the archival service.)

27. In addition, from at least June 2022 to present, the videos, still images, graphics and other digital content delivered by Screendollars to Exhibitors throughout the United States by download or otherwise as part of the content provisioning services have prominently borne Plaintiff's Mark — whether as watermarks on such videos/still images, labels on such graphics, sales and/or instructional documents associated with such content or otherwise — thus creating impressions among hundreds of Exhibitors annually and an estimated millions of moviegoers who patronize their theaters every year. Thus, for example, as of June 2022, Plaintiff estimates that such impressions were created among 3.4 million patrons attending movies monthly at 290 of Plaintiff's Exhibitor-customers theaters (and their 1060 collective movie screens) in nearly 110 of the 210 designated marketing areas (DMAs) nationwide, including approximately 75 of the top 100 DMAs.

---

[1] SCREENDOLLARS, www.screendollars.com/advertise-with-us (June 29, 2022) (downloaded from https://web.archive.org/web/20220629151332/ https://www.screendollars.com on May 12, 2026).

By October 2023, those numbers had grown to 3.6 million patrons, 336 theaters, 1096 screens, over 125 of 210 DMAs, and 80 of the top 100 DMAs. As of today, those numbers are 4.8 million patrons, 425 theaters, 1485 screens, approximately 140 of 210 DMAs, and over 85 of the top 100 DMAs. Throughout the period from June 2022 to present, Plaintiff has used Plaintiff's Mark throughout the United States in advertising its media brokering services in connection with brokering ads on behalf of thousands of Media Buyers (and Media Intermediaries) into those theaters' ad slots — including for the ad network Screenvision Media and, with and/or through it, brands and agencies such as Cadillac, The Walt Disney Company, Paramount/CBS, Horizon Media, and Initiative, among others.

### THE PLAINTIFF'S USE OF ITS MARK ON
### DIRECT DISTRIBUTION DIGITAL MEDIA PLATFORMS

28.    Screendollars has, since at least 2018, rendered its content provisioning and media brokering services in commerce via the company's weekly newsletter (sometimes referred to as the "Sunday newsletter"), which it distributes by email throughout the United States. *See,* **Exhibit 3**, a copy of an email via which Plaintiff's newsletter of June 12, 2022, was distributed in summary form with links allowing readers to access the full newsletter.[2] *See also,* **Exhibit 4**, a copy of Plaintiff's newsletter of June 19, 2022, including a third-party advertisement on page 4 for Screenvision Media.[3]

---

[2]    E-mail from SCREENDOLLARS (newsletter@screendollars.com) to thaddeusbouchard@gmail.com (June 12, 2022, at 5:35 pm)
[3]    Newsletter (Screendollars, Dover, Massachusetts), June 19, 2022.

29. Plaintiff similarly distributes two weekly reports throughout the United States: the "Wednesday" report, which Plaintiff has distributed by email since at least as early as 2022, and the "Friday" report, which it has been distributing by email since at least as early as 2024.

30. In addition, Plaintiff has, since at least as early as June 2022, rendered its content provisioning and media brokering services via custom email marketing campaigns (and occasional auxiliary paper mail campaigns) for clients. For those, Screendollars combines curated content with client advertising and targets client-specified distributions or the Screendollars newsletter subscriber list.

31. Screendollars initially targeted movie Exhibitors, Media Buyers and Media Intermediaries with the curated content of its electronic newsletter and twice-weekly reports. By at least as early as June 2022, the company added (to the weekly newsletter) movie reviews, celebrity news and interviews, and links to movie trailers and short-form entertainment videos, among other features, to broaden the appeal of the newsletter to entertainment news buffs and movie enthusiasts, whether in the general public, among Exhibitors, or among Media Buyers and Media Intermediaries (collectively, "Enthusiasts").

32. Screendollars has promoted its weekly email newsletter and its twice-weekly reports since their respective introductions through direct solicitation of Media Buyers, Media Sellers and Media Intermediaries throughout the United States and, beginning at least as early as mid-2021, through its web publishing platform, i.e., its website, which is also available throughout the United States.

33. As of June 2022, Plaintiff distributed its newsletter, with its curated content and brokered advertising, to an estimated 110,000+ worldwide subscribers per week, of whom an estimated 20,000+ were affiliated with Media Buyer-, Media Seller- or Media Intermediary-businesses across the U.S. (i.e., based in this country or with a significant presence here). By October 2023, those numbers had grown to nearly an estimated 198,000+ and 43,000+, respectively; and, at present, to nearly an estimated 330,000 and 50,000+, respectively. The 50,000+ subscribers estimated to be affiliated with Media Buyer-, Media Seller- or Media Intermediary-businesses across the U.S. include those affiliated with The Walt Disney Company, NBCUniversal, Ford Motor Company, MGM Resorts International, Horizon Media, and Initiative. Moreover, among those 50,000+ subscribers, over an estimated 2,500 hold positions at the manager level or above. (On information and belief, the foregoing are among the classes of businesses — and their decision-makers — that are targeted by Defendant in connection with the promotion and solicitation of its media brokering service).

34. From at least as early as June 2022 to this day, Screendollars has continuously used Plaintiff's Mark in commerce throughout the United States in connection with marketing and distributing its weekly newsletter, twice-weekly reports and custom campaigns. Thus, for example, Screendollars incorporates Plaintiff's Mark prominently into the mastheads of those distributions (including on downloaded copies thereof), which it delivers to tens of thousands of Media Buyers, Media Sellers, Media Intermediaries, Enthusiasts and others each week throughout the United States — and, in some instances, multiple times each week.

### THE PLAINTIFF'S USE OF ITS MARK ON
### <u>WEB PUBLISHING DIGITAL MEDIA PLATFORMS</u>

35. From at least as early as 2021 to present, Screendollars has continuously provided (or "rendered") content provisioning services throughout the United States via a web publishing platform, to wit, the company's website, www.screendollars.com. That site has, since at least as early as June 2022, paralleled the company's weekly email newsletter in content and focus, providing curated content for consumption by its audience — to wit, Media Buyers, Media Sellers, Media Intermediaries and Enthusiasts. Thus, for example, in addition to movie reviews and celebrity news paralleling those in the company's email newsletter, Plaintiff's website features ready access to movie trailers, movie times, and short-form entertainment videos (including celebrity interviews), among other features. *See, for example,* **Exhibit 5**, attached hereto, a reproduction of Plaintiff's website as of July 22, 2022,[4] with screenshots of its home page, as well as its "Newsletter," "Movie Times," "Directory," and "News" pages.

36. Plaintiff has also used its website to provide (or "render") media brokering since at least June 2021, placing advertisements available throughout the United States promoting third parties, e.g., by way of banner ads, "featured" directory listings and sponsored content. *See, for example,* **Exhibit 5**, *supra,* at p. 4, featuring Marvel Studios and Gravitas Ventures, among others, on its "Directory" page.

37. From at least as early as 2021 to present, Screendollars has promoted its web site via direct solicitation of Media Buyers, Media Sellers, and Media Intermediaries and through

---

[4]  SCREENDOLLARS (home page), July 22, 2022, https://screendollars.com (downloaded from https://www.screendollars.com on July 22, 2022).

word-of-mouth. During that same period, Plaintiff has used its other platforms to promote those services throughout the United States, as well, including, for example, its weekly email newsletter and twice-weekly reports.

38.    As of June 2022, Plaintiff's website was viewed by nearly an estimated 14,000 visitors per month. By October 2023, that number had climbed to over an estimated 71,000 visitors per month and, in the first five months of 2026, Plaintiff's website was visited approximately 5.1 million times for an average of over 1 million visitors per month. Plaintiff estimates that one-third of its visitors over these periods accessed its website from within and throughout the U.S.

39.    From at least as early as June 2022 to this day, Screendollars has continuously used Plaintiff's Mark in commerce throughout the United States in connection with marketing and rendering its website-based content provisioning services and media brokering services. Thus, for example, Screendollars uses that mark prominently on each page of the website, as well as in sub-page headers throughout.

**THE PLAINTIFF'S USE OF ITS MARK ON
SOCIAL MEDIA PLATFORMS**

40.    Since at least June 2022, Plaintiff has distributed curated content on social media platforms throughout the United States via accounts on Facebook, X (formerly, Twitter), Instagram, YouTube, and, since at least as early as February 2023, TikTok. Through those accounts, Plaintiff posts videos, news and commentary paralleling those of the company's website (albeit in an abbreviated format typical of social media). *See, for example,* **Exhibit 6,** attached hereto, a screenshot of a posting by Plaintiff to Instagram

15

on November 8, 2022.[5] Plaintiff uses those accounts to engage audiences and to direct them to its website, newsletters or other platforms, where it can provide them with more extensive curated content and brokered advertisements.

41.     Screendollars targets the curated content it posts to the social media sites at Media Buyers, Media Sellers, Media Intermediaries and Enthusiasts.  The format and content mix posted by it to each site varies in accord with expected site visitor demographics.

42.     On information and belief, the aforesaid social media sites (i) analyze the type of content of posts made by account holders such as Plaintiff to the respective site, (ii) algorithmically place those posts in "feeds" displayed to site visitors that have expressed or shown interest in content of that type, and (iii) include in those same feeds other account holders' posts of similar type. Plaintiff tags its posts with hashtags to influence the placement of its posts in such feeds and to facilitate direct access by site visitors to those posts.

43.     The aforesaid social media sites respond to site visitors' post selections (e.g., "mouse clicks" or screen touches) by bringing those visitors to the channel, profile or account page (collectively, "account page") of the account holder who made the posting. To maintain the interest of those redirected visitors, Screendollars maintains on its account page updated feeds of its prior posts, along with links to its website.

44.     As of October 2023, Plaintiff's posts were collectively making approximately 1.7 million impressions per month across all of its social media platforms. At present, that figure is

---

[5]     SCREENDOLLARS (@screendollars), Instagram (Nov. 8, 2022), https://www.instagram.com/p/ CktcFW8sFki/ (downloaded May 13, 2026).

approximately 2.5 million.  For both of those periods, Plaintiff estimates that 50% of the visitors accessed or access its social media platforms from within and throughout the U.S.

45.   From June 2022 to this day, Screendollars has continuously used Plaintiff's Mark in commerce in connection with marketing and rendering the company's content provisioning services through its accounts on social media. Thus, for example, Screendollars places Plaintiff's Mark on its account page, its posts to those sites, and in watermarks applied to video content in those posts.

**THE PLAINTIFF'S USE OF ITS MARK ON
ON DEMAND AUDIO/VIDEO DIGITAL MEDIA PLATFORMS**

46.   At least as early as April 2022, Plaintiff distributed content by way of the "Box Office Autopsy" audio podcast series and, subsequently, by way of the "Ticket to Ride" audio and video podcast series.  The series, initially published between April – November 2022 and December 2024 – August 2025, respectively on YouTube, Spotify and Apple Podcasts, remain available for streaming throughout the United States on those platforms to this day.

47.   Both podcast series targeted Media Buyers, Media Sellers, Media Intermediaries, and Enthusiasts. The home page of the "Box Office Autopsy" podcast on Apple Podcasts describes that series as providing "analysis of the results from the weekend that just concluded and a look forward to prospects for the week ahead." *See,* https://podcasts.apple.com/us/ podcast/boxoffice-autopsy/id1585155458.  The "Ticket to Ride" home page on that platform describes that series as "bring[ing] you inside the business of Hollywood, with insights from insiders who are on the ground and in the know." *See,* https://podcasts.apple.com/us/podcast/ticket-to-ride/id1789142060.

17

48.    Plaintiff promoted and promotes both podcast series via direct solicitation to Media Buyers, Media Sellers and Media Intermediaries, as well as via its weekly email newsletter and website (through which it also promotes the podcast series to Enthusiasts and others), which are available throughout the United States.

49.    From at least as early as April 2022 to present, Plaintiff has used Plaintiff's Mark in commerce throughout the United States in connection with marketing and rendering its content provisioning services on its podcasts, prominently displaying that mark on webpages and in weekly newsletters where the podcast series are advertised, as well as placing that mark on the cover art of podcast episodes (including those downloaded by podcast listeners and others).  *See,* **Exhibit 7,** the cover art of "Plaintiff's Box Office Autopsy" podcast, episode 36, of April 24, 2022,[6] on Apple Podcasts, and **Exhibit 8**, the cover art of Plaintiff's "Ticket to Ride" podcast, August 3, 2025, on YouTube.[7]

## THE PLAINTIFF'S MARK, REGISTERED AND COMMON LAW

50.    As evidenced in the discussion in ¶¶ 24 – 49, above, and the accompanying exhibits, Plaintiff has used Plaintiff's Mark in both its unregistered (common law) and registered forms in commerce throughout the United States continuously since at least as early as June 2022 in connection with the sale, offering for sale, marketing, advertising, promotion, distribution and rendering of its content provisioning services and media brokering services, as well as in connection with newsletters, reports, podcasts and other

---

[6]    BOX OFFICE AUTOPSY: Box Office Results for 4/22-4/24 (Apple Podcasts, Apr. 24, 2022)
[7]    TICKET TO RIDE: The Blair Mantz Project – TTR Welcomes Scott "Movie" Mantz (YouTube, Aug. 3, 2025).

goods provided by Plaintiff in connection with the aforesaid services (collectively, Plaintiff's goods and services).

51. Exhibits 2 – 8 are representative samples of website pages, email newsletters, social media posts and podcast cover art showing Plaintiff's use of Plaintiff's Mark in connection with Plaintiff's goods and services.

52. Plaintiff is the owner of valid and subsisting United States Trademark Registration No. 7,621,658 ("Plaintiff's Trademark Registration"), which issued on the Principal Register on December 24, 2024, from United States Trademark Application Serial No. 98/418,785, filed February 23, 2024, in the United States Patent and Trademark Office, for Plaintiff's Mark as used with downloadable electronic newsletters in the field of movies and the movie business, providing business information about movies and the movie business via a website, and providing entertainment information about movies and the movie business via a website.

53. Color is not claimed as a feature of Plaintiff's Mark, as registered, which is reprinted in Table 1, above, and identified as "Plaintiff's Mark (per federal registration)."

54. Attached hereto as **Exhibit 9** are representative samples of digital newsletters and website pages that were submitted by Plaintiff to the United States Patent and Trademark Office on February 23, 2024, in support of Plaintiff's application to register Plaintiff's Mark for the goods and services identified in Plaintiff's Trademark Registration.[8]

---

[8]   U.S. Trademark Application Serial No. 98418785, now, US Trademark Registration No. 7621658, Specimens, filed February 23, 2024.

55. As a result of its widespread, continuous, and exclusive use of Plaintiff's Mark to identify its goods and services and Plaintiff as their source, Plaintiff owns valid and subsisting federal statutory and common law rights to Plaintiff's Mark.

56. Plaintiff's Mark is distinctive to both the consuming public and the trade.

57. Plaintiff has expended substantial time, money, and resources on marketing, advertising, and promoting the goods and services offered, rendered, distributed, advertised or promoted under Plaintiff's Mark including, but not limited to (i) the development and implementation of a multi-platform marketing strategy, (ii) travel to, appearances at, and promotion of goods and services under Plaintiff's Mark at and within conferences, trade shows and other industry events and forums. During the period of February 2022 to present, Plaintiff has expended in excess of $2.6 million and sixty-four thousand (64,000) person-hours on such marketing, advertising and promotion.

58. Plaintiff distributes, provides, offers to sell, and sells, Plaintiff's goods and services under Plaintiff's Mark in the manner set forth in ¶¶ 24 – 49, above, by way of example, including, through its in-theater, direct digital distribution, web publishing, social media and on demand audio/video digital media platforms, as well as through direct solicitation, all by way of non-limiting example.

59. Plaintiff promotes and advertises its goods and services under Plaintiff's Mark in the manner set forth in ¶¶ 24 – 49, above, by way of example, including, through its in-theater, direct digital distribution, web publishing, social media and on demand audio/video digital media platforms, as well as through direct solicitation, all by way of non-limiting example.

60. Plaintiff distributes, provides, offers to sell, sells, promotes and advertises Plaintiff's goods and services under Plaintiff's Mark in the manner set forth in ¶¶ 24 – 49, above, to Media Sellers (including Exhibitors), Media Buyers, Media Intermediaries, along with Enthusiasts and consumers, among others.

61. The goods and services that Plaintiff offers under Plaintiff's Mark are of high quality insofar as they draw upon Plaintiff's knowledge of the movie and the movie business and media buying and media selling, as well as upon Plaintiff's expertise in digital media and upon the implementation and execution of Plaintiff's curated content delivery.

62. As a result of Plaintiff's expenditures and efforts, Plaintiff's Mark has come to signify the high quality of the goods and services designated thereby, and has acquired incalculable distinction, reputation, and goodwill.

63. Plaintiff's Mark and the goods and services it offers therewith have received significant accolades, as measured, for example, by the acceptance of those goods and services in the marketplace: Plaintiff has recently surpassed an estimated 8,500,000 readers and viewers per month across its web publishing, direct digital distribution, and social media platforms.

### DEFENDANT'S UNLAWFUL ACTIVITIES

64. Upon information and belief, Defendant is in the business of providing streaming and on-demand audio and video content throughout the United States.

65. Without Plaintiff's authorization, and upon information and belief, beginning after Plaintiff acquired protectable exclusive rights in Plaintiff's Mark, Defendant adopted and began using Defendant's Marks in commerce in connection with content provisioning

services and media brokering services, as well as in connection with newsletters, podcasts, and other goods provided by Defendant in connection with the aforesaid services (collectively, Defendant's goods and services).  In the discussion that follows, references to Defendant's content provisioning services and media brokering services include those associated goods, unless otherwise evident from context.

66. Defendant's Marks, each of which is a colorable variation of the others and all of which are confusingly similar to Plaintiff's Mark, are reprinted in Table 2, below, where a first of those marks is designated as "representative" and, the others, as numbered "variations" thereof.  Exhibits evidencing how Defendant uses each of the respective marks in connection with its content provisioning and/or media brokering services are also identified in that table.  Those exhibits are described in the paragraphs that follow.

22

67. To facilitate comparison, Plaintiff's Mark (both in its unregistered (common law) and federally registered forms) is reprinted in Table 3, immediately below Table 2.

**Table 2**



| Defendant's Mark (representative) | Defendant's Mark (variation 1) | Defendant's Mark (variation 2) | Defendant's Mark (variation 3) | Defendant's Mark (variation 4) | Defendant's Mark (variation 5) |
|---|---|---|---|---|---|
| *See,* Ex. 10 and Ex. 16 | *see,* Ex. 11 | *see,* Ex. 12 | *see,* Ex. 13 | *see,* Ex. 14 | *see,* Ex. 15 |

**Table 3**



| Plaintiff's Mark (per common law) | Plaintiff's Mark (per federal registration) |
|---|---|

68. Defendant's Marks are confusingly similar to Plaintiff's Mark insofar as each mark comprises a five-pointed star centered within the letter "S" and insofar as the marks use

the same or similar fonts for that letter, all by way of non-limiting example. Differences between Plaintiff's Mark, on the one hand, and Defendant's Marks, on the other hand, are at best colorable.

69. Upon information and belief, Defendant has been engaged in providing, offering to sell, selling, promoting and advertising content provisioning services using Defendant's Marks throughout the United States since after Plaintiff put Plaintiff's Mark into use in commerce with such services.  Exhibits 10 – 16 attached hereto are representative of such use:

- **Exhibit 10** is a true and correct copy of a screen shot of the "Talk" segment of Defendant's Hear & Now "blog" web page on Defendant's content consumer-facing web publishing platform, to wit, https://www.siriusxm.com/blog/, as of May 18, 2026, providing curated content in the form of celebrity news and photos and promoting Defendant's app platform, all in connection with Defendant's Mark (representative), as displayed on the body of the blog page and as a browser tab icon (or "favicon").

- **Exhibit 11** is a true and correct copy of a screen shot of a portion of Defendant's account page on the YouTube social media platform, at https://www.youtube.com/ results?search_query=siriusxm, as of May 18, 2026, providing curated content in the form of celebrity interviews and news, in connection with Defendant's Mark (variation 1) on the body of the account page, and in connection with Defendant's Mark (representative) on browser tabs.

- **Exhibit 12** is a true and correct copy of a screen shot of a portion of Defendant's account page on the Instagram social media platform, at

24

https://www.instagram.com/siriusxm/, as of May 18, 2026, providing curated content in the form of celebrity interviews and news, all in connection with Defendant's Mark (variation 2) and in connection with Defendant's Mark (representative) in browser tabs.

- **Exhibit 13** is a true and correct copy of a screen shot of the "Get closer to the stars" segment of the "home" web page on Defendant's content consumer-facing web publishing platform, at https://www.siriusxm.com/, as of May 18, 2026, providing curated content in the form of celebrity photos and content links, and promoting Defendant's app platform, in connection with Defendant's Mark (variation 3) and in connection with Defendant's Mark (representative) in browser tabs.

- **Exhibit 14** is a true and correct copy of a screen shot of the "Stage & Screen" page on Defendant's web app platform, at https://www.siriusxm.com/player/genre/entity/f0908966-ea6e-44ca-8928-a1d390a7f443, as of May 18, 2026, providing curated content in the form of movie, theater and celebrity photos and content links, in connection with Defendant's Mark (variation 4).

- **Exhibit 15** is a true and correct copy of a screen shot of a portion of the "SiriusXM Dealer Highlights" web page on Defendant's Media Seller-facing web publishing platform, at https://siriusxmcommunications.com/dealerhighlights/latest.aspx?, as of May 18, 2026, providing curated content in the form of celebrity photos and news, in connection with Defendant's Mark (variation 5) and in connection with Defendant's Mark (representative) in browser tabs.

25

- **Exhibit 16** is a true and correct copy of a screen shot of a CarPlay screen, as of May 18, 2026, displaying Defendant's Mark (representative) as an icon for activating delivery of curated content (e.g., celebrity news and podcasts) via Defendant's vehicle-based digital media platform.

70. On information and belief, Defendant has been engaged in providing, offering to sell, selling, promoting and advertising media brokering services using Defendant's Marks throughout the United States, e.g., brokering ad slots for placement of third-party advertisements on one or more of its web publishing, web app, social media, and vehicle-based digital media platforms in connection with providing curated content on those platforms as exemplified in Exhibits 10 – 16.  *See,* for example, SIRIUSXM, at https://www.siriusxm.com/ad-choices, downloaded May 18, 2026 (citing "third parties who, while serving or displaying ads on the websites or applications owned or operated by Sirius XM Radio LLC may place a cookie or other tracking device on … browser or mobile Internet enabled device[s]"); SIRIUSXM, at https://corporate.siriusxm.com/ business-solutions, downloaded May 18, 2026 ("…SiriusXM Media includes exclusive access to advertising on extensive Streaming and Podcast Networks [on] SiriusXM … and much more"); SIRIUS XM HOLDINGS INC., Annual Report (Form 10-K) (Jan 20, 2025) at p. 10 ("In May 2024, we began offering a free, advertising-supported plan, which we call Free Access, to select customers. Free Access is available in select 360L vehicles and is accessible by consumers after the expiration of their trial or paid subscription.").

71. On information and belief, Sirius XM Radio Inc. and Sirius XM Radio LLC are individually and/or jointly responsible for the acts complained of herein vis-à-vis

26

Defendant's content provisioning services and, along with Pandora Media, LLC (d/b/a Sirius XM Media), for the acts complained of herein vis-à-vis Defendant's media brokering services.  In the former regard, the name of Sirius XM Radio LLC is identified in the footer of the web pages of Exhibits 10, 13 and 15, on the account pages of Exhibits 11, 12, and on the Apple IOS App Store page for the web app of Exhibit 14; while the name of Sirius XM Radio Inc. appears on the top of that web app page temporally prior to the appearance of the words "Stream Live Radio & Podcasts," as well as in USPTO records, as the owner of U.S. trademark applications Serial Nos. 98/533,649 and 98/533,648 ostensibly directed to Defendant's Mark (representative). In the latter regard, *see,* for example, SIRIUSXM, "Business Solutions", https://corporate.siriusxm.com/business-solutions, downloaded Apr. 17, 2026 ("SiriusXM Media brings advertisers closer to the stories and music that listeners love, creating deep connections between fans and brands. As the gateway for marketers to the largest digital audio advertising ecosystem in North America, SiriusXM Media includes exclusive access to advertising on extensive Streaming and Podcast Networks across SiriusXM… and much more."); *see also,* SIRIUSXM MEDIA, "Terms of Service", https://www.siriusxmmedia.com/terms, downloaded Apr. 17, 2026 ("SiriusXM Media is a dba of Pandora Media, LLC ("Pandora Media") that sells advertising on behalf of Pandora Media, SiriusXM Media Inc., and other entities for which Pandora Media has contracted to sell advertising inventory.").

72.   On information and belief, the content provisioning services Defendant has provided, offered for sale, sold, promoted and advertised under Defendant's Marks — to wit, delivering curated digital content relating to entertainment, as well as to movies and the movie business (including celebrity news and interviews), via audio streaming, web

publishing, social media and mobile device app digital media platforms, among others — are identical to, overlap with and/or are otherwise similar to the content provisioning services Plaintiff has and continues to provide, offer for sale, sell, promote and advertise under Plaintiff's Mark — to wit, delivering curated digital content relating to movies and the movie business (including celebrity news and interviews), via the same or similar digital media platforms.

73.   On information and belief, the media brokering services Defendant has provided, offered for sale, sold, promoted and advertised under Defendant's Marks — to wit, brokering ad slots on its own or others' digital media platforms for placement of advertisements of others — are identical to, overlap with and/or are otherwise similar to the media brokering services Plaintiff has and continues to provide, offer for sale, sell, promote and advertise under Plaintiff's Mark — to wit, brokering ad slots on its own or others' digital media platforms for placement of advertisements of others.

74.   On information and belief, Defendant provides, offers for sale, and sells its content provisioning services and its media brokering services under Defendant's Marks through the same, similar, or overlapping channels as does Plaintiff vis-à-vis its content provisioning services and its media brokering services under Plaintiff's Mark:  including, for example, web publishing, social media, on demand or streaming audio/video, direct solicitation, and direct digital distribution platforms.

75.   On information and belief, Defendant promotes and advertises its content provisioning services and its media brokering services under Defendant's Marks through the same, similar or overlapping channels as does Plaintiff vis-à-vis its content provisioning services and its media brokering services under Plaintiff's Mark: including, for example,

web publishing, social media, on demand or streaming audio/video, direct solicitation, and direct digital distribution platforms.

76.    On information and belief, Defendant provides, offers for sale, sells, promotes, and advertises its content provisioning services under Defendant's Marks to consumers and Enthusiasts. This overlaps with Plaintiff, who provides, offers for sale, sells, promotes and advertises its content provisioning services under Plaintiff's Mark to consumers and Enthusiasts, among others — to wit, Media Buyers, Media Sellers and Media Intermediaries. Among this latter group (to wit, Media Buyers, and Media Intermediaries) are, on information and belief, those to whom Defendant provides, offers for sale, sells, promotes and advertises its media brokering services under Defendant's Marks. This includes, by way of non-limiting example, companies and personnel of the type identified above in connection with subscribership to Plaintiff's weekly email newsletter and twice-weekly reports.

77.    On information and belief, Defendant provides, offers for sale, sells, promotes and advertises its media brokering services under Defendant's Marks to Media Buyers and Media Intermediaries.  This overlaps with Plaintiff, who provides, offers for sale, sells, promotes and advertises its media brokering services under Plaintiff's Mark to Media Buyers and Media Intermediaries, as well as Media Sellers (namely, Exhibitors). Included in that overlap are, among others, Media Buyers and Media Intermediaries seeking ad slots for regional/national brands or ad campaigns.

78.    On information and belief, the services that Defendant offers under Defendant's Marks lack, among other things, qualities of substance and focus required in the relevant marketplace.

79. On information and belief, Defendant had knowledge of Plaintiff's Trademark Registration at least as early as December 24, 2024, in connection with the USPTO grant of that registration, and in any event not later than April 2025, in connection with letters of protest and, subsequently, opposition proceedings filed in the USPTO with respect to applications by Defendant to register Defendant's Mark (representative) in view of Plaintiff's Registration. Notwithstanding that knowledge, Defendant has persisted in the uses of Defendant's Marks that are the subject of this Civil Action.

80. Upon information and belief, Defendant's acts are willful, or at minimum knowing and in reckless disregard of Plaintiff's rights, and were undertaken with the purpose and/or effect of causing confusion, mistake, or deception as to source, sponsorship, or affiliation — whether by trading on Plaintiff's goodwill and misdirecting purchasers to Defendant (forward confusion), or, in the alternative, by saturating the marketplace with Defendant's Marks such that Plaintiff's Mark and goodwill are overwhelmed and misattributed to Defendant (reverse confusion) — and of diverting sales and business opportunities from Plaintiff.

81. Upon information and belief, Defendant adopted and began using Defendant's Marks after Plaintiff established priority in Plaintiff's Mark, and Defendant deployed Defendant's Marks in large-scale marketing and distribution that rapidly saturated the relevant channels for the content provisioning and media brokering services at issue here.

82. Upon information and belief, Defendant possesses substantially greater commercial strength than Plaintiff — including materially higher advertising expenditures, brand recognition, user base, distribution, and social-media reach — such that Defendant's use of confusingly similar marks materially affects perception of source, sponsorship, or

affiliation among the relevant consumers, to wit, Media Buyers, Media Sellers, Media Intermediaries, Enthusiasts and consumers, among others. Thus, for example, Defendant has over 30 million subscribers nationwide for its "Sirius XM"-branded vehicle-based and internet-only content provisioning services.[9] The former are installed on a free-trial basis in 84 percent of the new vehicles sold in the United States every year, and Defendant uses direct mail and email, among others, to convert free trial users into paying subscribers.[10] In 2024, Defendant's total revenue was over $6 billion, with advertising revenues of $167 million, and gross profit of $3.9 billion.[11] For that same year, Defendant's allocated programming and content expenses were $33 million, and its sales and marketing expenses were $45 million.[12] Plaintiff, on the other hand, has annual revenues of approximately $10 million, and cumulative marketing, advertising, and promotional expenditures since February 2022 on the order of $2.5 million, which annualizes at $625,000. Defendant's revenues, thus, exceed Plaintiff's by roughly 600-fold, and Defendant's advertising expenditures exceed Plaintiff's by over 70-fold.

83. Upon information and belief, because the Parties use similar marks for closely related goods and services in overlapping channels, the aforesaid relevant consumers are likely to be confused as to source, sponsorship, or affiliation — whether by believing Defendant's offerings emanate from, are sponsored by, or are affiliated with Plaintiff

---

[9]    Kirkpatrick v. Sirius XM Radio LLC, No. 3:24-cv-955-SI, 2025 U.S. Dist. LEXIS 202343, at *3-4 (D. Or. Oct. 14, 2025)

[10]    *Id.*

[11]    "SiriusXM – SiriusXM Reports Fourth Quarter and Full-Year 2024 Operating and Financial Results," https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-25-000004/siriq42024earningsreleases.htm (downloaded June 28, 2026).

[12]    Id.

(forward confusion), or, in the alternative, by believing Plaintiff's offerings emanate from, are sponsored by, or are affiliated with Defendant (reverse confusion).

84. Upon information and belief, Defendant knew or reasonably should have known of Plaintiff's prior rights before adopting and/or persisting in the use of Defendant's Marks, including through routine trademark searches and marketplace diligence.

85. The acts of Defendant complained of herein are causing and, unless restrained, will continue to cause damage and irreparable harm to Plaintiff and to its valuable reputation and goodwill with the consuming public for which Plaintiff has no adequate remedy at law.

## COUNTS

### COUNT I
### FEDERAL TRADEMARK/SERVICE MARK INFRINGEMENT
### FORWARD CONFUSION
### (15 U.S.C. § 1114)

86. Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 85, above, as though fully set forth herein.

87. Plaintiff is the owner of valid and subsisting United States Trademark Registration No. 7,621,658 ("Plaintiff's Trademark Registration") for Plaintiff's Mark, which is registered on the Principal Register of the United States Patent and Trademark Office. Plaintiff's use of Plaintiff's Mark in commerce throughout the United States has been continuous and predates Defendant's first use of Defendant's Marks in commerce.  As a consequence of Plaintiff's use of its mark in connection with content provisioning and media brokering services across all of Plaintiff's digital media platforms, as well as the expansion of that

use, from at least as early as June 2022 to present, Defendant cannot establish prior-user rights under 15 U.S.C. § 1115(b)(5) or otherwise as against Plaintiff or Plaintiff's Mark.

88.    Without the consent of Plaintiff, Defendant has used in commerce reproductions, counterfeits, copies, or colorable imitations of Plaintiff's Mark — to wit, Defendant's Marks — in connection with the sale, offering for sale, distribution, or advertising of goods and services, namely, Defendant's content provisioning services and media brokering services, covered by Plaintiff's Trademark Registration or sufficiently related thereto as to cause confusion, mistake or deception.

89.    Defendant's use of Defendant's Marks in connection with Defendant's content provisioning and media brokering services is likely to cause confusion, or to cause mistake, or to deceive consumers and the trade into believing that Defendant's goods and services originate from, are sponsored by, or are affiliated with Plaintiff (forward confusion). Defendant's conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

90.    Defendant's acts have been willful, knowing, and in reckless disregard of Plaintiff's rights.

91.    Defendant's conduct is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this Court. Plaintiff has no adequate remedy at law.

92.    As a direct and proximate result of Defendant's acts of infringement, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill, and is entitled to injunctive relief, Defendant's profits, actual damages, enhanced damages,

costs of the action, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117, together with prejudgment and post-judgment interest.

## COUNT II
## FEDERAL TRADEMARK/SERVICE MARK INFRINGEMENT
## REVERSE CONFUSION
## (15 U.S.C. § 1114)

93.    Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 85, above, as though fully set forth herein.

94.    Plaintiff is the owner of valid and subsisting United States Trademark Registration No. 7,621,658 for Plaintiff's Mark ("Plaintiff's Trademark Registration"), which is registered on the Principal Register of the United States Patent and Trademark Office. Plaintiff's use of Plaintiff's Mark in commerce throughout the United States has been continuous and predates Defendant's first use of Defendant's Marks in commerce. As a consequence of Plaintiff's use of its mark in connection with content provisioning and media brokering services across all of Plaintiff's digital media platforms, as well as the expansion of that use, from at least as early as June 2022 to present, Defendant cannot establish prior-user rights under 15 U.S.C. § 1115(b)(5) or otherwise as against Plaintiff or Plaintiff's Mark.

95.    Without the consent of Plaintiff, Defendant has used in commerce reproductions, counterfeits, copies, or colorable imitations of Plaintiff's Mark — to wit, Defendant's Marks — in connection with the sale, offering for sale, distribution, or advertising of goods and services, namely, Defendant's content provisioning services and media brokering services, covered by Plaintiff's Trademark Registration or so sufficiently related thereto as to cause confusion, mistake or deception.

96. Defendant possesses substantially greater commercial strength than Plaintiff, including materially higher advertising expenditures, brand recognition, user base, distribution, and social-media reach. As a result, Defendant's use of Defendant's Marks in connection with Defendant's content provisioning and media brokering services is likely to cause confusion, or to cause mistake, or to deceive consumers and the trade into believing that Plaintiff's goods and services originate from, are sponsored by, or are affiliated with Defendant (reverse confusion), thereby overwhelming Plaintiff's mark and goodwill and misappropriating for Defendant the goodwill and reputation that Plaintiff has built in Plaintiff's Mark. Defendant's conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

97. Defendant's acts have been willful, knowing, and in reckless disregard of Plaintiff's rights, and, upon information and belief, Defendant has committed the foregoing acts of infringement with full knowledge of Plaintiff's prior rights in Plaintiff's Mark and with the willful intent to cause confusion and to trade on, and overwhelm, Plaintiff's goodwill.

98. Defendant's conduct is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this Court. Plaintiff has no adequate remedy at law.

99. As a direct and proximate result of Defendant's acts of infringement, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill — including the destruction or diminution of the value of Plaintiff's Mark and Plaintiff's ability to control the reputation and goodwill associated therewith — and is entitled to injunctive relief, Defendant's profits, actual damages, enhanced damages, costs of the

action, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117, together with prejudgment and post-judgment interest.

**COUNT III**
**FEDERAL UNFAIR COMPETITION**
**FORWARD CONFUSION**
**(15 U.S.C. § 1125(a))**

100. Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 85, above, as though fully set forth herein.

101. Plaintiff has valid and legally protectable rights in Plaintiff's Mark, both by virtue of its federal registration and by virtue of its prior, continuous, and exclusive use of that mark in commerce throughout the United States in connection with Plaintiff's goods and services, including its content provisioning services and media brokering services. Such use, including the expansion thereof across Plaintiff's digital media platforms, predates Defendant's first use of Defendant's Marks in commerce. Defendant therefore cannot establish superior prior-user rights.

102. Defendant, in connection with goods and services, has used in commerce words, terms, names, symbols, devices, or combinations thereof — to wit, Defendant's Marks — that are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff, or as to the origin, sponsorship, or approval of Defendant's goods and services by Plaintiff.

103. Defendant's use of Defendant's Marks in connection with Defendant's content provisioning and media brokering services is likely to cause confusion, or to cause mistake, or to deceive consumers and the trade into believing that Defendant's goods and services originate from, are sponsored by, or are affiliated with Plaintiff (forward

36

confusion), including by causing consumers to believe, contrary to fact, that Defendant's goods and services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff.

104. Defendant's use of Defendant's Marks in connection with content provisioning and media brokering services also constitutes a false designation of origin and a false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of Defendant's goods and services in violation of 15 U.S.C. § 1125(a)(1)(A). Defendant's conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

105. Defendant's acts have been willful, knowing, and in reckless disregard of Plaintiff's rights, and, upon information and belief, Defendant's conduct as alleged herein is also intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendant with Plaintiff.

106. Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this Court. Plaintiff has no adequate remedy at law.

107. As a direct and proximate result of Defendant's acts of unfair competition, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill, and is entitled to injunctive relief, Defendant's profits, actual damages, enhanced damages, costs of the action, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1116, 1117,

and 1125(a), together with prejudgment and post-judgment interest.

**COUNT IV**
**FEDERAL UNFAIR COMPETITION**
**REVERSE CONFUSION**
**(15 U.S.C. § 1125(a))**

108.   Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 85, above, as though fully set forth herein.

109.   Plaintiff has valid and legally protectable rights in Plaintiff's Mark, both by virtue of its federal registration and by virtue of its prior, continuous, and exclusive use of that mark in commerce throughout the United States in connection with Plaintiff's goods and services, including its content provisioning services and media brokering services. Such use, including the expansion thereof across Plaintiff's digital media platforms, predates Defendant's first use of Defendant's Marks in commerce. Defendant therefore cannot establish superior prior-user rights.

110.   Defendant, in connection with goods and services, has used in commerce words, terms, names, symbols, devices, or combinations thereof — to wit, Defendant's Marks — that are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff, or as to the origin, sponsorship, or approval of Defendant's goods and services by Plaintiff.

111.   Defendant possesses substantially greater commercial strength than Plaintiff, including materially higher advertising expenditures, brand recognition, user base, distribution, and social-media reach. As a result, Defendant's use of Defendant's Marks in connection with Defendant's content provisioning and media brokering services is likely to cause

38

confusion, or to cause mistake, or to deceive consumers and the trade into believing that Plaintiff's goods and services originate from, are sponsored by, or are affiliated with Defendant (reverse confusion), thereby saturating the marketplace and overwhelming Plaintiff's mark and goodwill such that the consuming public comes to associate Plaintiff's Mark with Defendant rather than Plaintiff.

112. Defendant's unauthorized use in commerce of Defendant's Marks as alleged herein further constitutes use of a false designation of origin and a false or misleading description and representation of fact. Defendant's conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

113. Defendant's acts have been willful, knowing, and in reckless disregard of Plaintiff's rights, and, upon information and belief, Defendant's conduct as alleged herein is also intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Plaintiff with Defendant.

114. Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this Court. Plaintiff has no adequate remedy at law.

115. As a direct and proximate result of Defendant's acts of unfair competition, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill — including the destruction or diminution of the value of Plaintiff's Mark and Plaintiff's ability to control the reputation and goodwill associated therewith — and is entitled to injunctive relief, Defendant's profits, actual damages, enhanced damages, costs of the action, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1116, 1117, and 1125(a),

together with prejudgment and post-judgment interest.

**COUNT V**
**TRADEMARK INFRINGEMENT, DILUTION AND**
**UNFAIR COMPETITION UNDER**
**MASSACHUSETTS LAW**
**(Mass. Gen. Laws ch. 110H, § 13; and Common Law)**

116. Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 85, above, as though fully set forth herein. Plaintiff's use of Plaintiff's Mark in commerce in connection with content provisioning services and media brokering services throughout the United States, as detailed in those repeated and re-alleged paragraphs, included and includes the soliciting and rendering of those services and the ongoing use of that mark in commerce in connection therewith within the Commonwealth of Massachusetts from at least as early as June 2022 to present, including through Plaintiff's distribution of curated digital content and brokered advertisements via (i) Plaintiff's weekly email newsletter and twice-weekly reports to subscribers located in the Commonwealth, (ii) Plaintiff's website, social media pages, and audio and video podcasts to visitors from within the Commonwealth, and (iii) Plaintiff's in-theater digital media platforms to Exhibitors within the Commonwealth and their movie-going patrons, also within the Commonwealth, all by way of non-limiting example. *See,* by way of further non-limiting example, the discussion of Plaintiff's and Defendant's respective activities in Massachusetts and the impact on persons therein in ¶ 9, above.

117. Plaintiff has valid and legally protectable rights in Plaintiff's Mark under the laws of the Commonwealth of Massachusetts, including by virtue of Plaintiff's prior, continuous, and

exclusive use of Plaintiff's Mark in commerce in connection with content provisioning services and media brokering services within the Commonwealth.

118. Defendant has used Defendant's Marks in commerce in Massachusetts in connection with content provisioning and media brokering services that are identical or closely related to those offered by Plaintiff under Plaintiff's Mark, without Plaintiff's authorization.

119. Defendant's use of Defendant's Marks is likely to cause confusion, or to cause mistake, or to deceive as to the source, sponsorship, or affiliation of Defendant's goods and services with Plaintiff (forward confusion), and, in the alternative, is likely to cause the consuming public to believe that Plaintiff's goods and services originate from, are sponsored by, or are affiliated with Defendant, thereby overwhelming Plaintiff's mark and goodwill (reverse confusion).

120. Plaintiff's Mark is distinctive, inherently and/or by virtue of acquired distinctiveness developed through Plaintiff's prior, continuous, and exclusive use of Plaintiff's Mark in commerce in connection with content provisioning services and media brokering services.

121. Defendant's use of Defendant's Marks in commerce, as alleged herein, is likely to cause dilution of the distinctive quality of Plaintiff's Mark, and is likely to cause injury to Plaintiff's business reputation, including by saturating the marketplace with Defendant's Marks, overwhelming Plaintiff's Mark and goodwill, and impairing Plaintiff's Mark's capacity to identify and distinguish Plaintiff's content provisioning services and media brokering services. Defendant's conduct therefore violates Mass. Gen. Laws ch. 110H, § 13, and entitles Plaintiff to injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

122. Defendant's conduct further constitutes common law trademark infringement and unfair competition under the laws of the Commonwealth of Massachusetts.

123. Defendant's acts have been willful, knowing, and in reckless disregard of Plaintiff's rights.

124. Defendant's conduct is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this Court. Plaintiff has no adequate remedy at law.

125. As a direct and proximate result of Defendant's foregoing acts, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill, and is entitled to (a) injunctive relief; (b) actual damages; (c) Defendant's profits; (d) costs of the action; and (e) reasonable attorneys' fees as otherwise available under Mass. Gen. Laws ch. 93A, § 11 or other applicable law.

## COUNT VI
## UNFAIR AND DECEPTIVE TRADE PRACTICES
## UNDER MASSACHUSETTS LAW
## (Mass. Gen. Laws ch. 93A, §§ 2 and 11)

126. Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 125, above, as though fully set forth herein.

127. At all times relevant to this Civil Action, both Plaintiff and Defendant were and continue to be engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 1, including in the Commonwealth of Massachusetts.

128. Defendant's use of Defendant's Marks in commerce in connection with content provisioning and media brokering services offered to and performed for persons and

businesses in Massachusetts (*see*, e.g., ¶¶ 9 and 116, above) are identical or closely related to those offered and performed by Plaintiff under Plaintiff's Mark to such persons and businesses (*id.*), above.  Defendant's use (i) is unfair and deceptive in that it is likely to cause confusion, or to cause mistake, or to deceive as to the source, sponsorship, or affiliation of Defendant's goods and services with Plaintiff (forward confusion), and, in the alternative, is likely to cause the consuming public to believe that Plaintiff's goods and services originate from, are sponsored by, or are affiliated with Defendant, thereby saturating the marketplace and overwhelming Plaintiff's mark and goodwill (reverse confusion), (ii) offends established concepts of fairness, falls within at least the penumbra of the federal and state trademark and unfair-competition statutes and common law, and is immoral, unethical, oppressive, or unscrupulous, including insofar as Defendant adopted and persisted in the use of Defendant's Marks with knowledge of Plaintiff's prior rights, and thereby misappropriated for Defendant the goodwill and reputation that Plaintiff has built in Plaintiff's Mark and palmed off, or threatens to cause others to palm off, Defendant's services as those of, or as affiliated with, Plaintiff, and, therefore, (iii) constitutes unfair methods of competition and unfair or deceptive acts or practices declared unlawful by Mass. Gen. Laws ch. 93A, § 2.

129.    As a direct and proximate result of Defendant's aforesaid unfair methods of competition and unfair or deceptive acts or practices, Plaintiff has suffered and will continue to suffer a loss of money or property, including but not limited to those monies expended by Plaintiff on marketing, advertising, and promoting goods and services offered, rendered, distributed, advertised, or promoted under Plaintiff's Mark and including but not limited to damage to Plaintiff's business, reputation, and goodwill.

130. The acts and conduct of Defendant complained of herein falling within the purview of Mass. Gen. Laws ch. 93A, §§ 2 and 11 — namely, the aforesaid unfair methods of competition and unfair or deceptive acts or practices declared unlawful by Mass. Gen. Laws ch. 93A, § 2 — occurred primarily and substantially within the Commonwealth of Massachusetts, including insofar as Defendant has (i) directed, and continues to direct, solicitation and provision of its content provisioning services and media brokering services bearing Defendant's Marks into the Commonwealth; (ii) caused, and continues to cause, a likelihood of confusion, mistake, or deception among persons in the Commonwealth by such unfair methods of competition and unfair or deceptive acts or practices; and (iii) caused injury to Plaintiff, whose principal place of business and the locus of its goodwill in Plaintiff's Mark are situated in the Commonwealth.

131. Defendant's aforesaid acts have been willful, knowing, and in reckless disregard of Plaintiff's rights, and, upon information and belief, Defendant committed the acts complained of herein willfully and knowingly within the meaning of Mass. Gen. Laws ch. 93A, § 11, with full knowledge of Plaintiff's prior rights in Plaintiff's Mark and with the intent to cause confusion and to trade on, or overwhelm, Plaintiff's goodwill.

132. Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this Court. Plaintiff has no adequate remedy at law.

133. Plaintiff is accordingly entitled to (a) preliminary and permanent injunctive relief; (b) actual damages; (c) up to three, but not less than two, times such damages by reason of Defendant's willful or knowing violation of Mass. Gen. Laws ch. 93A, § 2; and (d) the

costs of this action and reasonable attorneys' fees, all pursuant to Mass. Gen. Laws ch. 93A, § 11.

**COUNT VII**
**TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**
**UNDER NEW YORK LAW**
**(N.Y. Gen. Bus. Law §§ 349, 360-l; and Common Law)**

134.    Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 85, above, as though fully set forth herein. Plaintiff's use of Plaintiff's Mark in commerce in connection with content provisioning services and media brokering services throughout the United States, as detailed in those repeated and re-alleged paragraphs, included and includes the soliciting and rendering of those services and the ongoing use of that mark in commerce in connection therewith within the State of New York from at least as early as June 2022 to present, including through Plaintiff's distribution of curated digital content and brokered advertisements via (i) Plaintiff's weekly email newsletter and twice-weekly reports to subscribers located in the State of New York, (ii) Plaintiff's website, social media pages, and audio and video podcasts to visitors from within that state, and (iii) Plaintiff's in-theater digital media platforms to Exhibitors within the State of New York and their movie-going patrons, also, within that state, all by way of non-limiting example.

135.    By way of further non-limiting example, Plaintiff estimates that its provision and promotion of services under Plaintiff's Mark in New York results in at least a few hundred thousand impressions of that mark per month in that state alone (not to mention those in other states throughout the country), and that on information and belief, as a result of Defendant's activities, its confusingly similar marks make impressions on at least 1 in 10 persons in New York in connection with Defendant's provision and

promotion of services similar to those of Plaintiff — and, likely, more than 1 in 10 among classes of businesses (and their decision-makers) that are targeted by Defendant in New York, a national hub of media buying and selling, in connection with the promotion and solicitation of Defendant's media brokering service.

136. As a consequence, Plaintiff estimates on information and belief that the number of persons in New York who encounter both Plaintiff's Mark and Defendant's Marks in connection with similar services offered by Plaintiff and Defendant, respectively, and who are likely to be confused, mistaken or deceived thereby is in the tens of thousands per month — a figure that, when compared with the population of that state, likely underestimates on information and belief the relative significance of such confusion, mistake or deception among Media Buyers, Media Sellers and Media Intermediaries in that state. In addition, on information and belief, Defendant's decision to use Defendant's Marks, the nature and extent of Defendant's use of those marks, and the revenues and profits of Defendant derived therefrom, all occurred, or were directed from, Defendant's respective headquarters in New York, New York.

137. Plaintiff has valid and legally protectable rights in Plaintiff's Mark under the laws of the State of New York, including by virtue of Plaintiff's prior, continuous, and exclusive use of that mark in commerce in connection with content provisioning services and media brokering services within the State of New York.

138. Defendant has used Defendant's Marks in commerce in New York, including by use, display, and sale of services of marks confusingly similar to Plaintiff's Mark in connection with content provisioning and media brokering services that are identical or

closely related to those offered by Plaintiff under Plaintiff's Mark, without Plaintiff's authorization.

139. Defendant's use of Defendant's Marks is likely to cause confusion, or to cause mistake, or to deceive as to the source, sponsorship, or affiliation of Defendant's goods and services with Plaintiff (forward confusion), and, in the alternative, is likely to cause the consuming public to believe that Plaintiff's goods and services originate from, are sponsored by, or are affiliated with Defendant, thereby overwhelming Plaintiff's mark and goodwill (reverse confusion).

140. Defendant's conduct constitutes injury to business reputation and dilution in violation of N.Y. Gen. Bus. Law § 360-l, insofar as Defendant's use of Defendant's Marks is likely to cause dilution of the distinctive quality of Plaintiff's Mark, whether by blurring or tarnishment, entitling Plaintiff to injunctive relief under § 360-l notwithstanding the absence of competition between the parties or the absence of confusion as to source.

141. Defendant's conduct further constitutes deceptive acts or practices in the conduct of business, trade, or commerce in violation of N.Y. Gen. Bus. Law § 349 (as in effect both before and after February 17, 2026), insofar as Defendant's use of confusingly similar marks is consumer-oriented, misleading in a material way, and has caused or is likely to cause injury to Plaintiff.

142. Defendant's use of confusingly similar marks is consumer-oriented and materially misleading because it is directed to consumers and trade participants in New York and elsewhere, and is likely to cause them to believe mistakenly that Defendant's goods and services originate from, are sponsored by, approved by, or affiliated with Plaintiff, or that Plaintiff's goods and services originate from, are sponsored by, approved by, or affiliated

with Defendant. That confusion injures consumers and trade participants by misleading them as to source, sponsorship, affiliation, and approval, and injures Plaintiff by diverting attention, goodwill, and business opportunities from Plaintiff.

143. To the extent any of Defendant's acts complained of herein occurred on or after February 17, 2026, those acts also constitute unfair, deceptive, or abusive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349(a) as amended, in that Defendant's continued use of Defendant's Marks (i) is likely to cause substantial injury to Plaintiff and to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition, and (ii) takes unreasonable advantage of consumers' lack of understanding of the true source, sponsorship, or affiliation of Defendant's services.

144. Defendant's conduct further constitutes common law trademark infringement and unfair competition under the laws of the State of New York, insofar as Defendant, in bad faith, adopted and used marks confusingly similar to Plaintiff's Mark with knowledge of Plaintiff's prior rights, thereby misappropriating the goodwill Plaintiff has developed in its mark and palming off Defendant's services as those of, or as affiliated with, Plaintiff.

145. Defendant's acts have been willful, knowing, and in reckless disregard of Plaintiff's rights.

146. As a direct and proximate result of Defendant's foregoing acts, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill, and is entitled to (a) injunctive relief under N.Y. Gen. Bus. Law §§ 349, 360-l, and the common law; (b) actual damages and disgorgement of Defendant's profits under the common law; (c) Plaintiff's actual damages, or fifty dollars, whichever is greater, under N.Y. Gen. Bus.

48

Law § 349(h), together with an increase of such damages up to three times the actual damages, not to exceed one thousand dollars, based on Defendant's willful and knowing violation of § 349, plus reasonable attorneys' fees; and (d) costs of the action.

**COUNT VIII**
**TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**
**UNDER CALIFORNIA LAW**
**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and Common Law)**

147. Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1 through 85, above, as though fully set forth herein. Plaintiff's use of Plaintiff's Mark in commerce in connection with content provisioning services and media brokering services throughout the United States, as detailed in those repeated and re-alleged paragraphs, included and includes the soliciting and rendering of those services and the ongoing use of that mark in commerce in connection therewith within the State of California from at least as early as June 2022 to present, including through Plaintiff's distribution of curated digital content and brokered advertisements via (i) Plaintiff's weekly email newsletter and twice-weekly reports to subscribers located in the State of California, (ii) Plaintiff's website, social media pages, and audio and video podcasts to visitors from within that state, and (iii) Plaintiff's in-theater digital media platforms to Exhibitors within the State of California and their movie-going patrons, also, within that state, all by way of non-limiting example.

148. By way of further non-limiting example, Plaintiff estimates that its provision and promotion of services under Plaintiff's Mark in California results in at least a few hundred thousand impressions of that mark per month in that state alone (not to mention those in other states throughout the country), and that on information and belief, as a result of Defendant's activities, its confusingly similar marks make impressions on at

least 1 in 10 persons in California in connection with Defendant's provision and promotion of services similar to those of Plaintiff — and, likely, more than 1 in 10 among classes of businesses (and their decision-makers) that, on information and belief, are targeted by Defendant in California, a national hub of media buying and selling, in connection with the promotion and solicitation of Defendant's media brokering service.

149. As a consequence, Plaintiff estimates on information and belief that the number of persons in California who encounter both Plaintiff's Mark and Defendant's Marks in connection with similar services offered by Plaintiff and Defendant, respectively, and who are likely to be confused, mistaken or deceived thereby is in the tens of thousands per month — a figure that, when compared with the population of that state, likely underestimates on information and belief the relative significance of such confusion, mistake or deception among Media Buyers, Media Sellers and Media Intermediaries in that state.

150. Plaintiff has valid and legally protectable rights in Plaintiff's Mark under the laws of the State of California, including by virtue of Plaintiff's prior, continuous, and exclusive use of that mark in commerce in connection with content provisioning services and media brokering services within the State of California.

151. Defendant has used Defendant's Marks in commerce in California in connection with content provisioning and media brokering services that are identical or closely related to those offered by Plaintiff under Plaintiff's Mark, without Plaintiff's authorization.

152. Defendant's use of Defendant's Marks is likely to cause confusion, or to cause mistake, or to deceive as to the source, sponsorship, or affiliation of Defendant's goods and

services with Plaintiff (forward confusion), and, in the alternative, is likely to cause the consuming public to believe that Plaintiff's goods and services originate from, are sponsored by, or are affiliated with Defendant, thereby overwhelming Plaintiff's mark and goodwill (reverse confusion).

153. Defendant's conduct further constitutes an unlawful, unfair, or fraudulent business act or practice in violation of Cal. Bus. & Prof. Code § 17200 et seq. (the "Unfair Competition Law" or "UCL"). Defendant's use of confusingly similar marks to misappropriate Plaintiff's goodwill, divert consumers, and trade upon Plaintiff's reputation constitutes conduct that is unlawful (in violation of, inter alia, 15 U.S.C. §§ 1114 and 1125(a) and the California common law of trademark infringement and unfair competition); unfair, in that it threatens an incipient violation of, and violates the policy and spirit of, the federal and state trademark and unfair-competition laws, the purposes of which are to protect consumers from confusion and to safeguard the goodwill of mark owners; and fraudulent, in that it is likely to deceive members of the consuming public as to the source, sponsorship, or affiliation of the parties' respective goods and services.

154. Defendant's conduct further constitutes common law trademark infringement and unfair competition under the laws of the State of California.

155. Defendant's acts have been willful, knowing, and in reckless disregard of Plaintiff's rights.

156. As a direct and proximate result of Defendant's foregoing acts, Plaintiff has suffered injury in fact and has lost money and property within the meaning of Cal. Bus. & Prof. Code § 17204, and has suffered and will continue to suffer irreparable damage to its business, reputation, and goodwill for which Plaintiff has no adequate remedy at law.

Plaintiff is accordingly entitled to preliminary and permanent injunctive relief and restitution under Cal. Bus. & Prof. Code § 17203; to actual damages, Defendant's profits, and exemplary damages under Cal. Civ. Code § 3294 on Plaintiff's California common-law claims; and to costs of the action and reasonable attorneys' fees as may be available under Cal. Code Civ. Proc. § 1021.5 or other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Screendollars LLC respectfully requests that this Court enter judgment in its favor and against Defendant, and grant the following relief:

a. A preliminary and permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, attorneys, successors, assigns, affiliates, and all persons acting in concert or participation with any of them, from using Defendant's Marks or any other mark confusingly similar to Plaintiff's Mark in connection with the advertising, promotion, offering for sale, sale, or rendering of any goods or services;

b. An order requiring Defendant to file with this Court and serve upon Plaintiff within thirty (30) days after entry of injunction a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

c. An order requiring Defendant to deliver up for destruction all labels, signs, prints, packages, wrappers, receptacles, digital assets, and advertisements in Defendant's possession or control bearing Defendant's Marks or any reproduction, counterfeit, copy, or colorable imitation thereof;

d. Pursuant to 15 U.S.C. § 1119, an order (i) directing the Director of the United States Patent and Trademark Office to refuse registration of, and cancel any registration of,

Defendant's Marks, and (ii) directing Defendant to abandon, withdraw, or expressly abandon any pending applications to register Defendant's Marks;

e.  An accounting of all gains, profits, and advantages derived by Defendant from its acts of infringement and unfair competition, and an award to Plaintiff of Defendant's profits pursuant to 15 U.S.C. § 1117(a) and applicable state law;

f.  An award of actual damages sustained by Plaintiff as a result of Defendant's acts of infringement and unfair competition, in an amount to be determined at trial;

g.  An award of enhanced damages and/or enhanced profits up to three times the amount of actual damages and/or profits pursuant to 15 U.S.C. § 1117(a); and the statutory enhancement of damages available under N.Y. Gen. Bus. Law § 349(h), in light of Defendant's willful and knowing conduct;

h.  Restitution under Cal. Bus. & Prof. Code § 17203 of money or property in which Plaintiff has an ownership or vested interest and that Defendant has acquired by means of its unfair competition;

i.  A declaration that this is an exceptional case and an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a); N.Y. Gen. Bus. Law § 349(h); Cal. Code Civ. Proc. § 1021.5; and any other applicable law;

j.  An award of Plaintiff's costs of suit, including the costs of this action;

k.  Pre-judgment and post-judgment interest at the maximum rate permitted by law;

l.  Exemplary or punitive damages on Plaintiff's common-law claims, including pursuant to Cal. Civ. Code § 3294, in light of Defendant's willful, oppressive, fraudulent, and malicious conduct;

m.  An award of Plaintiff's actual damages, together with the multiplication of those damages by up to three but not less than two times by reason of Defendant's willful or knowing violation of Mass. Gen. Laws ch. 93A, § 2, and an award of Plaintiff's reasonable attorneys' fees and the costs of this action, all pursuant to Mass. Gen. Laws ch. 93A, § 11;

n.  An order requiring Defendant, at its own expense, to engage in corrective advertising sufficient to dispel the consumer confusion caused by its infringing conduct; and

o.  Such other and further relief as this Court deems just and proper.


                                    Respectfully submitted,

                                    SCREENDOLLARS LLC

                                    By its attorneys,


                                    ___/s/ James E. Gallagher_____
                                    James E. Gallagher,
                                    BBO #677588
                                    DAVIS, MALM & D'AGOSTINE, P.C.
                                    255 State Street, Floor 11
                                    Boston, MA 02109
                                    jgallagher@davismalm.com

                                    David J. Powsner
                                    BBO #544784
                                    DAVIS, MALM & D'AGOSTINE, P.C.
                                    255 State Street, Floor 11
                                    Boston, MA 02109
Dated: July 6, 2026                 dpowsner@davismalm.com